# Illinois Official Reports

## Appellate Court

---

### *People v. French*, 2017 IL App (1st) 141815

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARCELLUS FRENCH, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-1815 |
| Filed<br>Rehearing denied | March 10, 2017<br>April 6, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-3147; the Hon. Mary Margaret Brosnahan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Kathleen T. Zellner & Associates, P.C., of Downers Grove (Douglas H. Johnson and Nicholas Curran, of counsel), for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, Eric Leafblad, Christine Cook, and Margaret A. Hayes, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE LAMPKIN delivered the judgment of the court, with opinion.<br>Presiding Justice Gordon and Justice Reyes concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant Marcellus French was found guilty by a jury of first degree murder, with a finding that he personally discharged a firearm, and aggravated battery with a firearm. He was sentenced to prison terms of 55 years and 15 years, respectively, to be served consecutively.

¶ 2    On appeal, he contends (1) the trial court abused its discretion by admitting hearsay and allowing the State to refer to it as substantive evidence during closing argument, and this constituted plain error because the evidence was closely balanced, (2) trial counsel rendered ineffective assistance by failing to object to certain statements by witnesses on the basis of lack of foundation, (3) the trial court's preliminary inquiry into defendant's *pro se* posttrial claims of ineffective counsel was an adversarial proceeding and violated due process, and (4) the trial court erred when it failed to appoint new counsel and hold a hearing on defendant's claims of ineffective trial counsel.

¶ 3    For the reasons that follow, we affirm the judgment of the circuit court.

## I. BACKGROUND

¶ 5    This case arose from the drive-by shooting that occurred on the evening of Thursday, August 19, 2010. Gunshots fired from a car struck and killed Roger Kizer and struck Estavion Thompson, who survived the attack. Eyewitnesses identified defendant Marcellus French as the shooter and codefendant Bodey Cook as the driver. Defendant was arrested January 20, 2011, and Cook was arrested February 16, 2011. A joint jury trial was held in 2013.

¶ 6    At the trial, the State's evidence showed that, at about 11 p.m. on the date of the offense, the victims, Kizer and Thompson, were outside near 7450 South Kenwood Avenue in Chicago. Kizer's family lived on that block. Kizer and Thompson were either sitting on the back of a friend's parked car or standing by the car in the street. Several other people were also outside, including Andre Stackhouse, Shevely McWoodson, and Sherman Johnson. People were drinking alcohol. The street was residential and illuminated by streetlights.

¶ 7    Thompson had "only a cup" of alcohol and could not recall whether people were smoking or selling marijuana. Thompson saw Cook drive a small greenish turquoise Cavalier down the street past Thompson's group and stop at a stop sign. Cook was alone in the car. Thompson had known Cook from the area for about three years. About 15 minutes later, Cook, who was still alone, drove toward Thompson's group a second time. Kizer tried unsuccessfully to wave or "flag [Cook] down." Kizer told Thompson he wanted to talk to Cook about "what was going on between" Cook and Kizer's family. About 10 minutes later, Cook drove toward the group a third time but Thompson did not see him approach because Thompson's back was facing Cook's car. Thompson heard gunshots and saw Kizer fall. Thompson tried to run but fell and could not get back up. He crawled to the grass by the sidewalk side of the parked car. He was shot in his legs, chest, and stomach. As he lay on the grass, he saw that Cook drove the car and the shooter in the passenger seat was a light-skinned male wearing a red hat. The police, however, did not recall Thompson giving that description of the shooter. Thompson also testified that the shooter yelled "b*** something" as the car drove away. Kizer died at the scene from a gunshot wound to his chest, and Thompson was taken to the hospital.

¶ 8    Thompson spoke with detectives at the hospital the next day and identified Cook as the driver from a photo array. At that time, Thompson did not know Cook's full name. Two days

later on August 22, Thompson viewed a black and white photo array that included defendant's photo, but Thompson did not identify anyone as the shooter from that array. At that time, Thompson knew defendant's name but not his full name. At the trial, Thompson said defendant at the time of the shooting "looked totally different" from his black and white picture in the photo array. Thompson could not remember whether he told the police on August 22 that defendant was the shooter. On January 20, 2011, Thompson went to the police station and identified defendant, whom Thompson knew "from around the same area," out of a four-person lineup as the shooter. Witnesses Stackhouse, McWoodson, and Johnson were also at the police station, but they were not present when Thompson viewed the lineup. In February 2011, Thompson identified Cook from a lineup as the driver. Thompson also identified defendant and Cook in court as the offenders.

¶ 9    Thompson testified that no one made him any promises in exchange for his testimony. At the time of the trial, he had a pending misdemeanor marijuana charge and prior felony convictions in 2005 for resisting a police officer and aggravated battery of a police officer and in 2004 for aggravated unlawful use of a weapon. When Thompson testified before the grand jury on February 16, 2011, he said he was under the influence when he had spoken with an assistant State's Attorney (ASA) in January 2011; however, at the trial Thompson denied being under the influence at the time of that conversation.

¶ 10   Andre Stackhouse was on parole at the time of the trial, failed to appear on the date specified by a subpoena, and was arrested and testified the next day. He had known both defendant and Cook since they were in preschool. Stackhouse had been drinking Tequila on the night of the shooting. He was standing a couple of houses away from the Kizer home and talking with two girls when he saw Cook drive by in a greenish blue car alone. Not long thereafter, Stackhouse saw Cook drive east on 74th Street and then south on Kenwood Avenue. Defendant was in the passenger seat and half of his body was hanging out the window. He had a gun in his hand. Stackhouse did not see anyone in the car wearing a hat. Stackhouse moved into a gangway and heard several gunshots but did not look toward the shooting. After the shooting, he went to Kizer and Thompson and saw that they were shot. Sherman Johnson had a gunshot hole in his hat. Stackhouse left the scene and did not talk to the police that night.

¶ 11   On August 24, 2010, Stackhouse was arrested for a gun offense. He spoke with detectives on August 26 about the August 19 shooting. From photographs, Stackhouse identified Cook as the driver and defendant as the shooter. Stackhouse also identified defendant and Cook as the offenders in the lineups conducted in January and February of 2011 and again at the trial. Stackhouse did not receive any promises concerning his gun offense or his probation violation in exchange for his testimony. He faced a possible prison sentence of three to seven years for the gun offense and received the minimum sentence of three years. He had convictions in 2011 for aggravated unlawful use of a weapon and in 2009 for possession of a stolen motor vehicle. When a defense investigator came to the Stackhouse home in June of 2012, Stackhouse's mother told the investigator to leave, and Stackhouse did not discuss the shooting with him.

¶ 12   Shevely McWoodson was Kizer's uncle. At the trial, McWoodson testified he had known Cook and defendant a few months prior to the shooting by seeing them on the street a few times. However, McWoodson previously told the grand jury that he had known defendant for about three years. At the time of the offense, McWoodson was with Kizer and a group of other people on south Kenwood Avenue talking. McWoodson saw Cook drive by once in a small car alone. Then McWoodson walked to his house a couple of houses away from the group to use

the restroom. When he was near the gate of his house, he saw Cook drive by again with defendant in the passenger seat. McWoodson saw defendant lean out the window, fire a gun, and shoot Kizer. McWoodson heard three gunshots and saw the gun emit flames when it was fired. He did not speak with police that night.

¶ 13    In January 2011, McWoodson went to the police station and identified Cook from a photo array as the driver and defendant from a lineup as the shooter. At trial, McWoodson testified he "pointed [defendant] out" before he asked the police to have everyone in the lineup smile. McWoodson knew defendant had a chipped tooth, which was visible when defendant smiled. However, according to McWoodson's grand jury testimony, he "knew" it was defendant but was not "sure," so he asked the detective to make the lineup participants smile and then saw defendant's chipped tooth and said, "That is him." At a second lineup in February 2011, McWoodson identified Cook as the driver, but McWoodson did not recall returning to the police station to view that second lineup. McWoodson either did not understand what a grand jury was or did not remember testifying before the grand jury in February 2011.

¶ 14    Sherman Johnson was Thompson's cousin. Johnson had known Cook and defendant his whole life. At the trial, Johnson testified that on the afternoon of August 19, 2010, everyone was standing in front of a school when Kizer unsuccessfully attempted to flag down Cook, who was driving a red Cadillac. Later that evening, Johnson was standing with the group on the 7400 block of south Kenwood Avenue. About 30 people were outside, and they were drinking alcohol and doing drugs. He heard gunshots and ran from the scene without looking to see the source of the gunfire. He never saw who fired the gunshots, was not grazed on his elbow by a bullet, and did not have a bullet knock any hat off his head.

¶ 15    Johnson fled Chicago a week after the shooting because he was wanted for an attempted murder that occurred in an unrelated case on August 25, 2011. He was apprehended and extradited back to Chicago on January 19, 2011. Thereafter, the detectives investigating the instant case brought him from the jail to the police station. Johnson claimed the detectives put him in a room with Thompson and urged him to "go with" Stackhouse's written statement. Johnson also claimed the police offered to help him with his pending case in exchange for his cooperation in this matter. Johnson denied or could not recall giving the police and ASA any statement. Johnson initially maintained he did not recall testifying before the grand jury in February 2011, later admitted on cross-examination that he did in fact testify before the grand jury, and then on redirect claimed again that he did not recall testifying before the grand jury. He denied identifying Cook and defendant as the offenders and merely pointed them out in the photo arrays as people he knew. Johnson denied identifying defendant and Cook as the offenders in lineups conducted in January and February of 2011. Ultimately, Johnson pled guilty in his pending case in 2012 to a lesser charge of aggravated battery with a firearm, faced a possible sentence of 6 to 30 years in prison, and received a 7-year prison term without the detectives' help.

¶ 16    The State impeached Johnson's trial testimony with the testimony of detectives and the ASA; Johnson's January 21, 2011, signed written statement; his February 18, 2011, grand jury testimony; and a January 2011 photograph of his elbow. According to his written statement, Johnson saw Cook drive by in a light green Chevy Cavalier. Cook was alone, and Kizer called out Cook's name to get his attention. Kizer's cousins had a "beef" or argument with Cook. Cook did not stop and sped off. When Cook drove by again about 15 to 30 minutes later, defendant was hanging out the passenger's-side window. The upper part of defendant's body

- 4 -

was hanging out the window, and a gun was in his hand. Defendant fired the gun several times. The detectives testified that Johnson identified defendant as the shooter and Cook as the driver in photo arrays in January 2011, identified defendant in a January 2011 lineup, identified Cook in a February 2011 lineup, and was never told he would receive help in any pending case in exchange for talking about this case.

¶ 17    When ASA Morgan Creppel interviewed Johnson before presenting his testimony to the grand jury in February 2011, Johnson confirmed that the police and detectives never made any promises to him in exchange for his cooperation. According to Johnson's grand jury testimony, he was standing with Kizer and Thompson on south Kenwood Avenue at the time of the offense. Kizer's cousin, who was selling marijuana, got into a truck with a buyer. As the truck drove away, the group noticed Cook, who was alone, follow the truck in a light turquoise Cavalier. When the truck returned, Cook, who was still alone, was still following the truck. Kizer tried to flag Cook down, but Cook sped off. No one in the group noticed Cook's car as it approached them the third time. Johnson heard the first gunshot and looked in the direction from which the sound came. Johnson was shocked, "actually just got stuck," and "couldn't even move." He saw defendant hanging out of the passenger's-side window of the car from his waist up, using the top of the car to try to balance himself, and pointing the gun at anybody and shooting. Cook was driving the car. Johnson saw Kizer get struck first and Thompson get struck next. Then bullets grazed Johnson's elbow and knocked his hat off his head.

¶ 18    The defense's evidence showed that defendant was with Romania Booker and her father Randy Alexander at the time of the shooting. They were at the home of Booker's grandmother. Booker was pregnant with defendant's child, and her due date was August 19, 2010, so defendant stayed with her in case her water broke. Alexander testified he and defendant stayed inside the house on August 19 but acknowledged they "were not joined at the hip." Alexander was convicted in 2011 of burglary and in 2007 of possession of a controlled substance. Booker testified that defendant remained by her side from noon on August 19 until the child was born on August 24. Booker stopped dating defendant before he was arrested in January 2011 in this case. Although Booker knew about the arrest, she never contacted the police to inform them of this alibi. Defendant's family helped Booker with expenses for the baby.

¶ 19    Cook's family members and friends testified that he was at the home of his aunt at the time of the shooting. He was setting up for and attending a large family surprise birthday party for the aunt that lasted from about 6 p.m. on Thursday, August 19 to 3:30 a.m. on Friday.

¶ 20    Defense investigator John Byrne testified that he had been a Chicago police detective and sergeant in the detective division for 25 years. When he went to Stackhouse's home in June 2012, he informed Stackhouse that he worked for the defense. Stackhouse agreed to speak with him about this case and invited him into the house. Byrne was at the house for about 30 minutes but did not make any video or audio recording. Byrne took notes during the interview, which he used to write his two-page, undated report and then destroyed the notes. According to Byrne, Stackhouse said he did not see the face of either the shooter or driver when the car drove past him because it was dark outside and the incident happened quickly. Stackhouse merely saw the passenger extend an arm out the open window and fire a gun. Furthermore, in January 2011, detectives signed Stackhouse out of jail, brought him to the police station, and informed him that witnesses had already identified defendant as the shooter and Cook as the driver. The detectives said they would help Stackhouse with his pending case if he corroborated the testimony of those witnesses. Although Stackhouse told the detectives what

they wanted to hear, they ultimately did not help him. Stackhouse mentioned his probation and asked Byrne if he could get in trouble for what he said during their interview. Stackhouse did not sign or review Byrne's report.

¶ 21 The jury found defendant guilty of the first degree murder of Kizer, with a finding that defendant personally discharged a firearm that proximately caused Kizer's death, and guilty of the aggravated battery with a firearm of Thompson. The trial court sentenced defendant to consecutive prison terms of 55 years for murder and 15 years for aggravated battery with a firearm. The jury also found Cook guilty of first degree murder and aggravated battery with a firearm.

¶ 22                                    II. ANALYSIS

¶ 23 On appeal, defendant argues that (1) the trial court abused its discretion by admitting hearsay—*i.e.*, that Kizer wanted to stop Cook's car and talk to him about something going on between Kizer's family and Cook—and allowing the State to refer to it as substantive evidence during closing argument, (2) trial counsel rendered ineffective assistance by failing to object to certain statements by witnesses on the basis of lack of foundation, (3) the trial court's preliminary inquiry into defendant's *pro se* posttrial claims of ineffective counsel was an adversarial proceeding and violated due process, and (4) the trial court erred when it failed to appoint new counsel and hold a hearing on defendant's claims of ineffective trial counsel.

¶ 24                                     A. Hearsay

¶ 25 Defendant contends that the trial court abused its discretion when it admitted hearsay during Thompson's testimony that Kizer told him Kizer wanted to stop Cook's car and talk to Cook about "something" that was "going on" between Cook and members of Kizer's family. Defendant complains that this information came before the jury again when the State impeached Johnson with his signed written statement to the police and ASA that Kizer tried to get Cook's attention by calling out his name and Kizer's cousins were having a "beef" with Cook. Defendant also argues that the trial court later allowed the State to use the hearsay during closing argument as substantive evidence of defendant's guilt.

¶ 26 Defendant has forfeited review of this issue by failing to both timely object and include this issue in his motion for a new trial. However, he asks us to review this issue under the plain error doctrine, arguing that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him.

¶ 27 In general, a defendant preserves an issue for review by timely objecting to it and including it in a posttrial motion. *People v. Denson*, 2014 IL 116231, ¶ 11. However, we may review claims of error under the plain error rule (Ill. S. Ct. R. 615(a)), which is a narrow and limited exception to forfeiture (*People v. Hillier*, 237 Ill. 2d 539, 545 (2010)). To obtain relief under this rule, defendant must show that a clear or obvious error occurred. *Id.* Defendant bears the burden of persuading the court that either (1) the evidence at the hearing was so closely balanced (regardless of the seriousness of the error) as to severely threaten to tip the scales of justice against the defendant or (2) the error was so serious (regardless of the closeness of the evidence) as to deny the defendant a fair trial and challenge the integrity of the judicial process. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). In order to determine whether the plain-error doctrine should be applied, we must first determine whether any error occurred. *Id.*

¶ 28        A trial court's evidentiary rulings on hearsay testimony are reviewed for an abuse of discretion, which occurs when the trial court's ruling is arbitrary, fanciful, or unreasonable or when no reasonable person would take the view adopted by the trial court. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). Hearsay evidence is testimony regarding an out-of-court statement offered to prove the truth of the matters asserted. *People v. Sullivan*, 366 Ill. App. 3d 770, 779 (2006).

> "The term *matters asserted* as employed in the definition of hearsay includes both matters directly expressed and matters the declarant necessarily implicitly intended to express. When the declarant necessarily intended to express the inference for which the statement is offered, the statement is tantamount to a direct assertion and therefore is hearsay. The declarant necessarily intends to assert (i.e., implicitly asserts) matters forming the foundation for matters directly expressed in the sense that such additional matters must be assumed to be true to give meaning to the matters directly expressed in the context in which that statement was made. [Citation.] To illustrate, the question "Do you think it will stop raining in one hour?" contains the implicit assertion that it is currently raining." (Emphasis in original.) Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 801.1, at 635-36 (6th ed. 1994).

The presence or absence in court of the declarant of the out-of-court statement is irrelevant to a determination as to whether the out-of-court statement is hearsay. *People v. Lawler*, 142 Ill. 2d 548, 557 (1991). Unless hearsay falls within an exception to the hearsay rule, it is generally inadmissible due to its lack of reliability and the inability of the opposing party to confront the declarant. *Caffey*, 205 Ill. 2d at 88.

¶ 29                                      1. Thompson's Testimony

¶ 30        According to the record, Thompson testified that when Cook drove toward the group the second time, Kizer tried unsuccessfully to flag him down. When the prosecutor asked Thompson if Kizer told him why Kizer tried to stop Cook, counsel for Cook raised a hearsay objection. The prosecutor argued the testimony was elicited to prove motive and was not hearsay. Cook's counsel argued motive was not a hearsay exception, the statement was not made in the defendant's presence, it might be speculation, there was no foundation, and admission would violate defendant's right to confront witnesses. Defendant's counsel joined the objection and argued it clearly was hearsay and motive was not an exception to the hearsay. The trial court overruled the objection, found the testimony was not hearsay because it was not offered for the truth of the matter, and allowed the testimony to explain the course of conduct. The trial court added that very often victims' statements made just prior to their murder were admissible. Thompson then testified that Kizer said he wanted to stop Cook to talk "to him about what was going on between, something that his family and whatever, whoever has going on."

¶ 31        We find the trial court erred in admitting Thompson's hearsay testimony that Kizer said he wanted to stop Cook to talk to him about something that was going on between Cook and Kizer's family. Contrary to the trial court's ruling, the statement was not admissible for the non-hearsay purpose of explaining the course of conduct because Kizer's out-of-court statement cannot be used to explain Kizer's own conduct. See *People v. Carroll*, 322 Ill. App. 3d 221, 223 (2001) (statements offered for their effect on the listener or to explain the subsequent course of conduct *of another* are not hearsay).

- 7 -

¶ 32    Furthermore, we cannot agree with the trial court's ruling that the statement was not hearsay because it was offered for some reason other than to prove the truth of the matter asserted. Kizer's statement that he wanted to stop the car to talk to Cook about something contains the implicit assertion that Kizer believed he observed Cook in that car. This is not a situation where the out-of-court statement was relevant simply because of the fact it was said. *E.g.*, *People v. Poe*, 121 Ill. App. 3d 457 (1984) (testimony that the witness spoke to the defendant over the telephone at a given time was offered as an alibi and thus was not hearsay); *People v. Shoultz*, 289 Ill. App. 3d 392, 395-96 (1997) (a statement offered to prove the listener had notice of the information contained therein was not hearsay). Here, the relevance of the implicit assertion in Kizer's statement depends on Kizer believing that it was true, so it was offered for the truth of its content and therefore is hearsay. Similarly, Kizer's directly expressed assertion that he wanted to talk to Cook about something that was going on between Cook and Kizer's family is also relevant only for the truth of its content.

¶ 33    On appeal, the State argues that Thompson's statement was admitted for the proper purpose to explain why Kizer tried to flag down Cook, the statement was not hearsay, the statement was admissible under the declarant's then-existing, state-of-mind exception to the hearsay rule, and the statement was admissible to suggest Cook and defendant's motive. Citing *Caffey*, 205 Ill. 2d at 91, the State argues that the evidence was admissible because the declarant murder victim, Kizer, was unavailable to testify, there was a reasonable probability that the proffered hearsay statements were truthful, and the statements were relevant to a material issue in the case. We disagree.

¶ 34    Illinois Rule of Evidence 803(3) (eff. Apr. 26, 2012) provides that a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)" is not excluded by the hearsay rule, even though the declarant is available as a witness. This hearsay exception, however, does not include "(A) a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will; or (B) a statement of declarant's then existing state of mind, emotion, sensation, or physical condition to prove the state of mind, emotion, sensation, or physical condition of another declarant at that time or at any other time when such state of the other declarant is an issue in the action." *Id.* Rule 803(3) has eliminated the requirements under Illinois law, which did not exist in any other jurisdiction, of findings that the declarant was unavailable to testify and a reasonable probability exists that the statement was truthful. Ill. R. Evid. 803(3), Committee Commentary (adopted Sept. 27, 2010).

¶ 35    Rule 803(3) does not permit Thompson to testify to Kizer's intent, plan, or motive to stop Cook and talk to him about something because Kizer's state of mind was not relevant to a material issue in the case. See *People v. Munoz*, 398 Ill. App. 3d 455, 481(2010) (witness's testimony that the murder victim had said the defendant was a jealous and controlling boyfriend was inadmissible hearsay where the victim's state of mind was not relevant to a material issue and the only possible relevancy of her statement was to establish defendant's motive to kill her). Perhaps Kizer's state of mind might have been relevant if defendant or Cook had claimed to have acted in self-defense, but here the material issues were the identities of the driver of the car and the shooter in the passenger seat. Under the plain terms of Rule 803(3), Kizer's belief that Cook was driving the car and Kizer's intent to stop the car to talk to

Cook about a dispute that could serve as Cook's motive for the subsequent shooting do not constitute then-existing, state-of-mind hearsay exceptions.

¶ 36    The State also cites *People v. Coleman*, 347 Ill. App. 3d 266, 270 (2004), to support the proposition that hearsay statements offered not for the truth of the matter asserted but to demonstrate motive are admissible when relevant. In *Coleman*, the out-of-court statements were the murder victim's "to-do" list, which included to "[g]et a divorce" and statements to witnesses that she intended to divorce her husband and leave the state. *Id.* at 269. The court held that these out-of-court statements, in addition to evidence of the victim's packed suitcase and the "to-do" list being found only a few feet from her body, indicated that the defendant killed the victim after she told him of her plans to divorce him and, thus, the out-of-court statements were admissible, not to show the victim intended to divorce her husband but rather to demonstrate the victim's state of mind and the effect of those statements on the defendant, *i.e.*, his motive to kill her. *Id.* at 270-71. The State argues Thompson's testimony was not offered for the truth of the matter asserted but to demonstrate defendant's motive to shoot Kizer, which was relevant and admissible. We disagree. In order for Kizer's out-of-court statement to be relevant to show motive, Kizer's statement that his family members were having an argument with Cook had to be true. Thus, the State cannot credibly claim that the testimony was not offered for the truth of the matter asserted. We conclude that the admission of Thompson's hearsay testimony was error and will address below whether this error constitutes plain error.

¶ 37                              2. Johnson's Prior Inconsistent Statements

¶ 38    According to the record, information similar to Thompson's hearsay testimony came before the jury again when the State confronted Johnson with portions of his signed written statement to the police and ASA that Kizer tried to get Cook's attention by calling out his name and that Kizer's cousins were having a "beef" or argument with Cook. Although Johnson denied making the signed statement, the State perfected its impeachment of Johnson during the testimony of Detective Martin, wherein the relevant excerpts of Johnson's written statement were admitted into evidence.

¶ 39    We find that the admission of Johnson's prior inconsistent statement that Kizer called Cook's name and Cook and Kizer's cousins were having a "beef" was not erroneous because the statements contained therein were admissible as an exception to hearsay either as substantive evidence or to impeach Johnson's credibility.

¶ 40    In a criminal case, a prior statement may be admissible as substantive evidence if it is inconsistent under section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2010)). *People v. Harvey*, 366 Ill. App. 3d 910, 922 (2006). Section 115-10.1(c) of the Code provides, in relevant part, that a prior inconsistent statement may be offered not just for purposes of impeachment but as substantive evidence if the witness is subject to cross-examination concerning the statement; the statement narrates, describes, or explains an event or condition of which the witness had personal knowledge; and the statement is proved to have been written or signed by the witness. 725 ILCS 5/115-10.1(b), (c)(2)(A) (West 2010); see also Ill. R. Evid. 801(d)(1)(A)(2)(a) (eff. Oct. 15, 2015).

¶ 41    To satisfy the exception's "personal knowledge" requirement, " 'the witness whose prior inconsistent statement is being offered into evidence must actually have seen the events which are the subject of that statement.' [Citations.]" (Internal quotation marks omitted.) *People v.*

*McCarter*, 385 Ill. App. 3d 919, 930 (2008) (quoting *People v. Cooper*, 188 Ill. App. 3d 971, 973 (1989)). Accordingly, " '[e]xcluded from this definition are statements made to the witness by a third party, where the witness has no firsthand knowledge of the event that is the subject of the statements made by the third party.' " *Id.* (quoting *People v. Morgason*, 311 Ill. App. 3d 1005, 1011 (2000)). The witness must have observed the events he is speaking of, rather than have heard about them afterwards. *Morgason*, 311 Ill. App. 3d at 1011. Section 115-10.1 seeks to advance the legislature's goal of "prevent[ing] a 'turncoat witness' from merely denying an earlier statement when that statement was made under circumstances indicating it was likely to be true." *People v. Thomas*, 354 Ill. App. 3d 868, 882 (2004).

¶ 42    If a prior inconsistent statement is not admissible as substantive evidence, that statement can only be used for impeachment when the testimony of that witness does "affirmative damage" to the party's case. *People v. Cruz*, 162 Ill. 2d 314, 361 (1994) (citing *People v. Bradford*, 106 Ill. 2d 492, 500 (1985)). "It is only when the witness'[s] testimony is more damaging than his complete failure to testify would have been that impeachment is useful." *People v. Sims*, 285 Ill. App. 3d 598, 610 (1996) (citing *People v. Weaver*, 92 Ill. 2d 545, 563-64 (1982)). See also *People v. Martinez*, 348 Ill. App. 3d 521, 532 (2004) (damaging testimony "is not limited to direct contradictions but also includes evasive answers, silence, or changes in positions"). For a witness's testimony to be affirmatively damaging, as opposed to merely disappointing, it must give "positive aid" to the other side. *People v. Johnson*, 2013 IL App (1st) 111317, ¶ 47.

¶ 43    Johnson's statement to the police that Kizer called Cook's name was admissible as substantive evidence because Johnson's signed statement demonstrated that he was present at the scene to hear Kizer call Cook. However, Johnson's signed statement does not indicate whether his statement that Kizer's cousins had a "beef" with Cook was based on Johnson's personal knowledge. Nevertheless, Johnson's trial testimony that the incident between Kizer and Cook happened earlier during the afternoon on the date of the shooting and at a different location outside a school affirmatively damaged the State's case. Specifically, the State's evidence showed the incident between Kizer and Cook occurred after 11 p.m. on south Kenwood Avenue during Cook's second drive-by and shortly before Cook returned a third time with defendant, who shot and killed Kizer. Johnson also affirmatively damaged the State's case when he disavowed his prior signed statement and grand jury testimony, which identified defendant and Cook as the offenders, claimed the prior signed statement was a forgery, and alleged the police put him in a room with his cousin Thompson and urged Johnson to "go with" Stackhouse's signed written statement in exchange for a deal on Johnson's pending attempted murder case. Accordingly, Johnson's prior inconsistent statement about the "beef" between Kizer's cousins and Cook was admissible for impeachment purposes. See *People v. Morales*, 281 Ill. App. 3d 695, 701 (1996) (although the trial court improperly allowed a witness's handwritten statement as substantive evidence, that error was harmless because the statement was admissible to impeach the witness's credibility).

¶ 44    Additionally, even if Johnson's statement that Kizer's cousins had a "beef" with Cook was admitted erroneously as substantive evidence, the error was harmless because essentially the same evidence was properly and substantively introduced through Johnson's grand jury testimony, and there is no personal knowledge requirement for grand jury testimony under section 115-10.1(c)(1). *People v. Donegan*, 2012 IL App (1st) 102325, ¶¶ 37-38; *Morales*, 281 Ill. App. 3d at 701; *Harvey*, 366 Ill. App. 3d at 921-22. Accordingly, we find no error in the

admission of Johnson's prior inconsistent statements.

¶ 45                           3. The Prosecutor's Closing Argument

¶ 46      According to the record, the prosecutor stated that when Cook drove by the second time, Kizer tried to flag Cook down to talk to him. Thereafter, defense counsel argued there was no evidence concerning any DNA, fingerprints, bullet casings at the scene, turquoise car, or motive. Defense counsel argued the jury could not even think about motive because a motive had not been shown. In rebuttal, the prosecutor argued the jury should not discount eyewitness testimony and "[t]here was a motive. Cook had a beef with Kizer." The trial court overruled codefendant Cook's objection, and the prosecutor continued to argue that "Cook had a situation with Kizer" and was motivated by anger to commit the drive-by shooting.

¶ 47      Defendant argues the prosecutor improperly countered the defense argument that emphasized the lack of motive by using the improperly admitted out-of-court statements as substantive evidence of motive. We disagree.

¶ 48      Prosecutors are afforded wide latitude in closing argument and have the right to comment upon the evidence presented and reasonable inferences based upon the evidence. *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). The prosecutor may also respond to comments made by defense counsel that clearly invite a response. *Id.* It is proper for a prosecutor to reflect upon the credibility of witnesses and urge the fearless administration of the law if it is based on facts in the record or inferences fairly drawn from the facts elicited. *People v. Bryant*, 94 Ill. 2d 514, 523-24 (1983). In order to assess whether an error occurred, we must view the closing argument in its entirety, and challenged remarks must be viewed in context. *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007). A defendant cannot claim error where the prosecutor's remarks are in reply to and invited by defense counsel's argument. *People v. Miller*, 115 Ill. App. 3d 592, 602 (1983) (when the defense raises an issue in closing argument, it cannot complain because it "opened the door and invited comment on inadmissible evidence").

¶ 49      We find no error where the trial court overruled the objection to the prosecutor's remarks during closing argument. The remarks about motive were invited by defense counsel. As discussed above, Johnson's grand jury testimony—that Kizer's cousin was a passenger in a truck and was engaged in selling drugs and Cook was following that truck so Kizer tried to stop Cook's car the second time Cook drove by following the truck—was admissible as substantive evidence and was more detailed but essentially the same as Johnson's prior inconsistent signed statement about a "beef" between Kizer's cousins and Cook.

¶ 50                                      4. Plain Error

¶ 51      Contrary to defendant's argument on appeal, we find that the only complained-of statement that constituted inadmissible hearsay was Thompson's testimony that Kizer said he wanted to stop Cook to talk "to him about what was going on between, something that his family and whatever, whoever has going on."

¶ 52      As discussed above, Thompson's hearsay contains the implicit assertion that Kizer believed he observed Cook in the car during the second drive-by. This implicit assertion that the deceased victim identified Cook does not pose a substantial risk of unfair prejudice to defendant, who, according to all the witnesses, was not an occupant of the car until the third or final drive-by. In addition, Thompson's actual description of what Kizer wanted to talk to

Cook about was too vague to indicate a dispute existed between Kizer's family and Cook that motivated Cook—and by extension, defendant—to commit the shooting. However, assuming *arguendo* the inadmissible hearsay was prejudicial to defendant, we find it does not rise to the level of plain error because the evidence in this case was not so closely balanced that the error alone severely threatened to tip the scales of justice against defendant.

¶ 53    Thompson positively identified Cook as the driver when the police spoke to him at the hospital the next day after the shooting. Although two days after the shooting Thompson did not identify anyone in the photo array, which included defendant's picture, as the shooter, that photo array consisted of black and white photos printed on paper, and Thompson testified that defendant looked "totally different" in his photo array picture from his actual appearance. Our review of the record indicates that defendant's picture in the photo array is slightly blurred around his chin area and his hair was longer than when he participated in the lineup, from which Thompson positively identified defendant as the shooter. Moreover, Thompson was in the hospital recovering from his injuries and surgery at the time he viewed the photo array. Although defendant states Thompson told Detective Shirley Colvin two days after the shooting that "Tony" and "Ricky" were in the car, defendant is not correct. According to the record, Detective Colvin initially testified on cross-examination that she wrote in her notes of the investigation that someone said Tony and Ricky were in the car and she attributed those notes to her August 2010 conversation with Thompson. However, on redirect, the State demonstrated that Detective Colvin's notes of her conversation with Thompson were separate from the notes wherein someone mentioned Tony and Ricky, so Detective Colvin clarified that Thompson never mentioned Tony and Ricky as suspects.

¶ 54    Stackhouse had known both defendant and Cook since they were in preschool and identified them from photo arrays as the offenders only five days after the shooting. Stackhouse had the longest opportunity to observe the offenders' approach during the final drive-by because he noticed Cook's car while it drove east on 74th Street and then turned south onto Kenwood Avenue. Furthermore, the upper half of defendant's body was hanging outside the passenger's-side window, defendant did not conceal his face, and Stackhouse stood on the sidewalk on the west side of Kenwood Avenue with an unobstructed view of the passenger's-side of Cook's car as it drove south on Kenwood Avenue. Although it was evening, the area was illuminated by streetlights, and Stackhouse even saw the gun in defendant's hand. Investigator Byrne's testimony failed to impeach Stackhouse's positive identifications of the shooter and the driver because Stackhouse denied speaking to Byrne about the shooting, Stackhouse never reviewed or signed Byrne's undated typed report of his alleged interview of Stackhouse, Byrne did not make an audio or video recording of the alleged interview, and Byrne destroyed the notes he allegedly took during the interview.

¶ 55    Thompson's and Stackhouse's identifications of defendant and Cook as the offenders were corroborated by McWoodson's testimony and Johnson's prior inconsistent statements from his signed written statement and grand jury testimony. McWoodson was somewhat confused concerning some details, like whether he previously came to the criminal court building to appear before the grand jury and whether he identified defendant from a lineup as the shooter before McWoodson saw defendant's chipped tooth. Nevertheless, McWoodson knew Cook and defendant prior to the date of the shooting and identified them as the driver and shooter. Johnson's attempt to disavow his signed written statement and grand jury testimony, identifying Cook and defendant as the offenders, was unavailing. Johnson's statements

identifying Cook as the driver and defendant as the shooter were essentially consistent with and even more detailed than the identification testimony of Thompson, Stackhouse, and McWoodson. Moreover, the testimony of the detectives and ASA established that Johnson's signed statement and grand jury testimony were accurate, voluntary, and not made in exchange for any promises of help in his pending case.

¶ 56    Although Stackhouse, McWoodson, and Johnson did not speak with police immediately after the shooting occurred, that is not surprising considering some of the witnesses were on probation and illegal drug use and sales and the consumption of alcohol were occurring on the street at the time of the shooting. Moreover, Stackhouse and Johnson spoke to the police only after they were arrested for separate offenses involving guns.

¶ 57    The defense opposed the State's identification evidence with weak alibi evidence. Booker asserted that defendant remained by her side from noon on the date of the August 19, 2010, shooting until their child was born five days later, but even Booker's father conceded that defendant was not "joined at the hip" with anyone. Moreover, even though Booker was aware of defendant's January 2011 arrest in this matter, she never informed the police about the alleged alibi to show that the father of her child was not at the scene of the shooting. Cook's alibi concerning the family party was similarly weak, where family and friends asserted the party went from about 6 p.m. on Thursday, the date of the shooting, until about 3:30 a.m. the following Friday morning, and no photographs documenting Cook's presence at such an allegedly momentous family occasion were offered into evidence.

¶ 58    To support the proposition that the evidence in the instant case was closely balanced, defendant cites *People v. Gonzalez*, 326 Ill. App. 3d 629 (2001) (reversal was warranted under the harmless error standard because the evidence was closely balanced and the erroneous jury instruction was unduly stressed by the prosecutor in closing argument), and *People v. Johnson*, 2012 IL App (1st) 091730 (reversal was warranted where, in addition to other errors, the trial court failed to confirm during *voir dire* that the jury understood and accepted the *Zehr* principles and the testimony of the State's eyewitnesses and the defendant's alibi witnesses was impeachable). Both those cases, however, are distinguishable from the instant case.

¶ 59    In *Gonzalez*, 326 Ill. App. 3d at 632, 635, the defendant's conviction relied on the testimony of two eyewitnesses who gave conflicting accounts of what the gunman wore and viewed him under inadequate lighting conditions when he emerged from an alley. Furthermore, the facts of the case gave no indication that the two eyewitnesses knew the defendant prior to the shooting. Here, in contrast the eyewitnesses stated that the lighting conditions on the residential street were adequate and they knew defendant and Cook prior to the shooting.

¶ 60    In *Johnson*, 2012 IL App (1st) 091730 ¶ 48, the court found the trial court's failure to comply with the *Zehr* principles during *voir dire* constituted plain error because the evidence was closely balanced. Specifically, the court noted that the State's two identification witnesses were street gang rivals of the defendant and at war with the branch of the gang of which the defendant was a member. *Id.* ¶¶ 46-47. Further, one of those two witnesses did not identify the defendant on the day of the shooting, despite having known him for four years, and none of the State's other witnesses were able to testify that they saw the defendant at the scene. *Id.* ¶ 46. The defendant's alibi consisted of three friends or acquaintances who asserted four years after the shooting that the defendant was in Kentucky at the time of the shooting and attended a Super Bowl party. *Id.* ¶ 47. The court concluded that "the relative credibility of the State's

identification witnesses over the reliability of the defendant's alibi witnesses is by no means obvious or apparent." *Id.* The court reversed the defendant's conviction based on the trial court's failure to comply with the *Zehr* principles during *voir dire*, admission of irrelevant and prejudicial information concerning the defendant's drug conviction, and admission of an eyewitness's prior consistent statement identifying defendant as one of the shooters in the vehicle. *Id.* ¶ 79.

¶ 61    Unlike in *Johnson*, the evidence in the instant case was not closely balanced. The eyewitnesses were not involved in any street gang warfare with defendant and Cook, and there was no evidence of any street gang membership. Moreover, Thompson's inability to identify defendant as the shooter shortly after the incident does not detract from the credibility of two of the State's other identification witnesses, Stackhouse and Johnson. Thompson knew defendant from around the neighborhood but did not know his full name, whereas Stackhouse and Johnson had known both Cook and defendant for many years, since they were children. On the day after the shooting, Thompson, while in the hospital, told the police that Cook, whom Thompson had known for about three years, was the driver and identified him from a photo array. Thompson's failure to tell the police at that time that defendant was the shooter was not surprising where Thompson did not notice the car approach the group the third time because his back was facing the car, he ran when he heard the gunshots, he fell to the ground, and he crawled to the grass before observing Cook's car and its occupants. In addition, Thompson explained that his inability to identify defendant from the photo array two days after the shooting was because defendant, whom Thompson did not know as well as Stackhouse and Johnson knew defendant, did not resemble defendant's picture in that photo array. Thompson recognized defendant as the shooter when he saw him in person in the January 2011 lineup that was conducted after defendant was arrested. Stackhouse and Johnson's identification testimony of defendant was stronger than Thompson's. Five days after the shooting, Stackhouse told the police that Cook was the driver and defendant was the shooter and identified them from photo arrays. As discussed above, Johnson's attempt to disavow his identifications of defendant and Cook as the offenders was refuted by his prior inconsistent statements, which were admissible as substantive evidence.

¶ 62    Unlike in *Johnson*, the relative credibility of the State's identification witnesses over the reliability of defendant's alibi witnesses was obvious and apparent. Booker's alibi testimony was not sound; its veracity was taxed by her assertion that defendant constantly remained by her side inside her grandmother's home for five consecutive days until she finally went into labor and delivered their child. Even Booker's father acknowledged that he remained at the grandmother's home for only one day, August 19, 2010, the date of the shooting. Moreover, defendant's family helped Booker with the baby's expenses, and she never informed the police of this alibi even though she knew defendant was arrested in January 2011.

¶ 63    We find, based on the record, that defendant does not meet his burden to show that the error was prejudicial, *i.e.*, "that the quantum of evidence presented by the State against [him] rendered the evidence closely balanced." (Internal quotation marks omitted.) *People v. Piatkowski*, 225 Ill. 2d 551, 566 (2007). The error in admitting Thompson's hearsay testimony—the essential substance of which was properly admitted through Johnson's prior inconsistent statements—did not severely threaten to tip the scales of justice against defendant. Because defendant has failed to establish plain error, we hold him to the forfeiture of this

- 14 -

claim.

¶ 64                        B. Ineffective Assistance of Trial Counsel

¶ 65        Defendant argues he was denied effective assistance of counsel when his attorney failed to object to certain testimony of Thompson and a statement by Johnson on the basis of lack of foundation. Specifically, defendant argues Thompson's testimony—that Kizer said he wanted to talk to Cook about something that was going on between Kizer's family and Cook—did not indicate when Kizer made the statement, who was present, what prompted the statement, or precisely what Kizer told Thompson. Furthermore, Johnson's statement—that Kizer's cousins were having a "beef" with Cook—did not indicate Johnson's basis for this knowledge, when or where the statement was made, or who was present when it was made.

¶ 66        A defendant alleging a claim of ineffective assistance of counsel must satisfy both prongs of the test discussed in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which requires a showing that "counsel's performance was deficient" and the deficient performance "prejudiced the defense." To satisfy the first prong, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The second prong requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. If an ineffectiveness claim can be disposed of on the ground of insufficient prejudice, then that course should be taken, and the court does not need to consider the quality of the attorney's performance. *Id.* at 697.

¶ 67        In reviewing a claim of ineffective assistance of counsel, this court reviews counsel's actions under the totality of the circumstances of the individual case. *People v. Shatner*, 174 Ill. 2d 133, 147 (1996). Judicial scrutiny of counsel's performance is highly deferential, and counsel's trial strategy is given a strong presumption of reasonable professional assistance. *Strickland*, 466 U.S. at 689. To establish deficient performance, defendant must identify counsel's acts or omissions that allegedly are not the result of reasonable professional judgment and overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy. *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007); *Strickland*, 466 U.S. at 690. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Defendant must show that counsel's errors were so serious and his performance was so deficient that he did not function as the counsel guaranteed by the sixth amendment. *Perry*, 224 Ill. 2d at 342.

¶ 68        According to the record, Cook's counsel did object to Thompson's testimony on the basis of, *inter alia*, foundation, and defendant's counsel joined the objection when she also raised her hearsay objection. The trial court overruled all the objections raised by the defense. Admissible testimony is limited to matters of which the witness has personal knowledge through his own senses. *People v. Enis*, 139 Ill. 2d 264, 294-95 (1990). Contrary to defendant's argument on appeal, the State established a proper foundation for Thompson's statement, which indicated that Kizer said it when Thompson observed Kizer try to stop Cook's car during the second drive-by. This occurred after 11 p.m. on August 19, 2010, while Kizer and Thompson were sitting or standing near a parked car on south Kenwood Avenue with other

people Thompson named during his trial testimony. The record establishes that basic foundational requirements were met concerning Thompson's complained-of statement, so defendant cannot satisfy either the performance or prejudice prong of the *Strickland* test.

¶ 69 Defendant also faults counsel for failing to object to Johnson's prior inconsistent statement from his signed written statement that Kizer's cousins were having a "beef" with Cook. The admission of an out-of-court statement to show inconsistency with trial testimony requires an adequate foundation. See, *e.g.*, *People v. Hallbeck*, 227 Ill. App. 3d 59, 63 (1992) (foundation required whether a prior inconsistent statement is admitted for substance or for impeachment). A proper foundation includes directing the witness toward the time, place, circumstances, and substance of the statement, including the person to whom it was made, as well as to the substance of the statement. *Id.* at 62; *People v. Cobb*, 97 Ill. 2d 465, 479-80 (1983). The witness then must have the opportunity to explain the inconsistency. *Hallbeck*, 227 Ill. App. 3d at 62.

¶ 70 The record establishes the basic foundational requirements were met when the prosecutor asked Johnson about his presence at the police station in January 2011, whether he spoke with the detectives and ASA, whether he signed each page of his January 21, 2011, written statement, whether his statement was voluntary, and whether he told the ASA and detective that he was present at the scene of the shooting, he observed Kizer attempt to stop Cook's car, and Kizer's cousins were having a "beef" with Cook. Although Johnson's signed statement did not specifically indicate the source of his knowledge about the "beef," this did not prejudice defendant where, as discussed above, Johnson's prior inconsistent statements were properly admitted as substantive evidence through his grand jury testimony, which explained that the "beef" involved Cook following Kizer's cousin, who was engaged in selling drugs, and Johnson observed that conduct just prior to the shooting. See *Donegan*, 2012 IL App (1st) 102325, ¶ 38 (because the same testimony was properly introduced substantively through the witnesses' grand jury testimony, any alleged error by the trial court in permitting the introduction of their handwritten statement was harmless). Because defendant cannot show that he was prejudiced by this evidence, we find that he has failed to establish a claim of ineffective assistance of counsel.

¶ 71                                C. Propriety of the *Krankel* Preliminary Inquiry

¶ 72 Defendant argues he was denied procedural due process by the manner in which the trial court conducted a preliminary inquiry into his *pro se* posttrial allegations of ineffective assistance of trial counsel pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). Defendant argues that the trial court violated his right to procedural due process by turning the *Krankel* preliminary inquiry into an adversarial proceeding (1) without appointing new counsel and precluding defendant from presenting the witnesses and evidence he cited to support his *pro se* motion, (2) without giving defendant the opportunity to cross-examine his trial counsel under oath about her representations concerning the extent of her investigation and the substance of her conversations with witnesses, and (3) accepted as true trial counsel's unsworn and unchallenged factual representations and opinions that she acted reasonably and in accordance with trial strategy.

¶ 73 Defendant argues that the procedural similarities between a *Krankel* preliminary inquiry, where the defendant must show possible neglect, and proceedings under the first stage of the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)), where the

defendant's claim of a constitutional violation must show an arguable basis in law or fact, support the notion that a defendant undergoing a *Krankel* preliminary inquiry is due at least the same amount of process granted under the Act. Defendant contends a trial court during a *Krankel* preliminary inquiry must refrain from making factual findings or credibility determinations and must accept the defendant's factual allegations, unless positively refuted by the record, until counsel is appointed and an evidentiary hearing is held. According to defendant, the inquiry became adversarial because the trial court invited defense trial counsel "to essentially testify as to what steps she took to investigate Defendant's alibi so as to rationalize her failures to call witnesses and introduce certain evidence as matters of trial strategy. Although the State was not involved in this preliminary inquiry, the effect was the same."

¶ 74 The issue raised by defendant challenging the preliminary *Krankel* inquiry on due process grounds presents a question of law. Because the question presented is one of law, we determine it " 'independently of the trial court's judgment.' " *People v. Williams*, 188 Ill. 2d 365, 369 (1999) (quoting *In re Lawrence M.*, 172 Ill. 2d 523, 526 (1996)). The common law procedure developed from *Krankel* is triggered when a defendant raises a *pro se* posttrial claim of ineffective assistance of trial counsel. *People v. Patrick*, 2011 IL 111666, ¶ 29. It is settled that new counsel is not automatically appointed when that type of claim is raised. *People v. Moore*, 207 Ill. 2d 68, 77 (2003). Instead, the trial court first examines the factual basis of the defendant's claim. *Id.* at 77-78. If the trial court determines the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. *Id.* at 78. A claim lacks merit if it does "not bring to the trial court's attention a colorable claim of ineffective assistance of counsel" (*People v. Johnson*, 159 Ill. 2d 97, 126 (1994)) or is "conclusory, misleading, or legally immaterial" (internal quotation marks omitted) (*People v. Burks*, 343 Ill. App. 3d 765, 774 (2003)). However, if the allegations show possible neglect of the case, new counsel should be appointed. *Moore*, 207 Ill. 2d at 78. The goal of a *Krankel* proceeding is to facilitate the trial court's full consideration of a defendant's *pro se* claims of ineffective assistance of trial counsel and thereby potentially limit issues on appeal. *Patrick*, 2011 IL 111666, ¶ 41; *People v. Jocko*, 239 Ill. 2d 87, 91 (2010).

¶ 75 According to defendant's *pro se* allegations, his trial counsel failed to, *inter alia*, (1) present the testimony of Booker's grandmother and defendant's mother to support his alibi, (2) present the records of defendant's cell phone to show it was engaged in a call with the phone of defendant's mother at the time of the shooting, and (3) subpoena GPS records regarding defendant's cell phone to show he was at the home of Booker's grandmother at the time of the offense.

¶ 76 We reject defendant's assertion that the trial court's examination of the factual basis of defendant's *pro se* allegations that counsel was ineffective turned the preliminary inquiry into an adversarial proceeding. "[S]ome interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." *Moore*, 207 Ill. 2d at 78. A trial court assesses the defendant's *pro se* claim based on (1) defense counsel's answers to questions and explanations to facts and circumstances surrounding the defendant's allegations, (2) a brief discussion between the trial court and the defendant, or (3) the trial court's knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face. *Id.* at 78-79.

¶ 77    Our review of the record establishes that the trial court properly conducted an appropriate and impartial *Krankel* preliminary inquiry. Defendant was allowed to argue his position consistent with the claims in his *pro se* motion. Next, trial counsel was given a chance to describe or explain her actions or decisions, and then defendant had the opportunity to respond to trial counsel's statements. There is no merit to defendant's allegation that the trial court's permissible inquiries of defense counsel were the equivalent of permitting the State's adversarial participation in the preliminary inquiry against the *pro se* defendant. Accordingly, defendant's assertions of due process violations lack merit.

¶ 78                                    D. Denial of the *Krankel* Motion

¶ 79    Defendant argues that the trial court erred when it failed to appoint new counsel for defendant and conduct a hearing on his *pro se* posttrial claims of ineffective assistance of trial counsel. First, defendant argues that trial counsel failed to present the testimony of Donna Alexander, who is the grandmother of alibi witness Booker and would have testified that defendant was at her home on the night of the shooting, waiting for Booker to go into labor. Second, counsel failed to present the testimony of Melva Brown, who is defendant's mother and would have testified that at the time the shooting occurred she was on the telephone with defendant while he was at Alexander's home. Third, counsel failed to introduce records to show that the cell phone registered to defendant was engaged in a telephone call with Brown's telephone at the time of the shooting. Specifically, the 911 call concerning the shooting was placed at 11:27:49 p.m., and defendant's cell phone records showed his phone was engaged in a call with a number registered to his mother from 11:24:49 p.m. to 11:27:15 p.m. Fourth, counsel failed to subpoena GPS records from defendant's cell phone provider to show his cell phone was in the vicinity of Alexander's home at the time of the shooting. Defendant cites case law to support the proposition that technology exists to track the location of a cell phone based on "pings" between cell phone towers.

¶ 80    Strategic choices made by defense counsel after a thorough investigation of the law and facts relevant to the plausible options are virtually unchallengeable. *People v. King*, 316 Ill. App. 3d 901, 913 (2000). Moreover, a decision whether to present a particular witness is within the realm of strategic choices generally not subject to attack on the grounds of ineffective assistance of counsel. *Id.* However, even counsel's tactical decisions may be deemed ineffective when they result in counsel's failure to present exculpatory evidence of which counsel is aware. *Id.* A defendant can overcome the strong presumption that defense counsel's choice of strategy was sound if counsel's decision appears so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy. *Id.* at 916. A trial court's decision concerning the appointment of counsel based on a posttrial claim of ineffective assistance is reviewed for manifest error. *McCarter*, 385 Ill. App. 3d at 941; see *In re Kness*, 277 Ill. App. 3d 711, 718 (1996) (manifest error occurs when the error is clearly evident, plain, and undisputable).

¶ 81    During the *Krankel* preliminary inquiry, trial counsel stated she did not present the testimony of Alexander because Alexander told counsel that she went to bed at 7 p.m. on the night of the shooting and, thus, could not account for defendant's whereabouts for the rest of the evening. Counsel acknowledged that defendant's phone records indicated a call was occurring between his cell phone and his mother's telephone near the time of the shooting; however, defendant would have needed to testify that he was in possession of his phone and

participating in that call in order to give that evidence credibility, and it was not advisable for him to testify due to his criminal history. Furthermore, the phone records indicated that defendant had been texting Booker on the evening of the shooting, which would have diminished the alibi testimony that defendant never left Booker's side that evening. Counsel stated that she provided defendant with the phone records, and they reviewed the strategy many times while he was incarcerated. She also reviewed the strategy many times with defendant's mother.

¶ 82    Although defendant claims on appeal that trial counsel failed to *subpoena* GPS records, the record indicates his claim before the trial court initially focused on counsel's failure to *present* the GPS records. According to the record, defendant told the trial court that defense counsel "subpoenaed [the GPS] records and she did not use them within the trial." Counsel explained "[t]here was no evidence that placed [defendant] with a phone at a certain location." The trial court sought clarification on whether there was evidence that a GPS said defendant was miles away from the scene at the time of the shooting. Before defendant interrupted, defense counsel stated, "not only was there no GPS, there was no GPS that said it was [defendant]." When the trial court said, "I want to make sure that there's not something called GPS evidence that said his phone was in a particular location," counsel responded, "Correct."

¶ 83    At the hearing on defendant's motion to reconsider the denial of his *Krankel* motion, defendant stated, "We had the GPS records—well, I asked her to subpoena the GPS records," "She was informed, your Honor, to get these records," and "so, for the record, [trial counsel] did not subpoena the GPS records, but she was told, in the beginning of the case, when she was retained to represent me that my cell phone records needed to be pulled, and my GPS records needed to be pulled to support my alibi testimony."

¶ 84    A claim that counsel failed to subpoena GPS records is distinct from a claim that either (1) counsel failed to present GPS records that were obtained but determined not to be helpful or (2) counsel sought the GPS information, found that it did not exist and, thus, did not go through the formality of issuing a subpoena. The record is unclear whether defendant's claim before the trial court evolved from a failure to present GPS records to a failure to subpoena GPS records.

¶ 85    Nevertheless, we conclude that the trial court did not err when it denied defendant's posttrial ineffective counsel motion without appointing new counsel and conducting a hearing because defendant's claims pertained only to matters of trial strategy and did not show possible neglect of the case. Neither Alexander nor Brown had seen defendant for many hours prior to the shooting, and defendant's criminal history made it extremely inadvisable for him to take the witness stand to lend any credibility to the telephone records by testifying that he in fact was the person using his phone at the time of the shooting. Moreover, any GPS records connected to defendant's cell phone would have shown only the location of his cell phone at the time of the murder and not necessarily his location. Consequently, his testimony similarly would have been necessary to support the GPS records in order to tie his location to the location of his cell phone at the time of the shooting.

¶ 86    Our review of the record establishes that the trial court conducted a thorough examination of defendant's claims. Therefore, we affirm the trial court's finding that defendant's claims involved matters of trial strategy and did not rise to the level of ineffectiveness.

¶ 87                                             III. CONCLUSION

¶ 88           For the foregoing reasons, we affirm the judgment of the trial court.

¶ 89           Affirmed.