NOTICE
Decision filed 07/21/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230402-U

NO. 5-23-0402

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 20-CF-343 |
| | ) | |
| JOSH STOVER, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Moore and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Plain error review of defendant's forfeited claims was not warranted where the record demonstrated no error in prosecutor's rebuttal closing argument.

¶ 2    Following a jury trial, the defendant, Josh A. Stover, was convicted of two counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2022)) and was sentenced to seven years in the Illinois Department of Corrections followed by one year of mandatory supervised release. The defendant appeals his conviction, arguing his case should be remanded for a new trial where in rebuttal closing argument the prosecutor (1) vouched for the credibility of the State's witnesses, (2) shifted the burden of proof to the defense, (3) misstated the evidence, and (4) asserted facts not in evidence. Alternatively, the defendant argues that trial counsel was ineffective for failure to preserve the record. For the reasons that follow, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4    In March 2020, the defendant was charged with four counts of aggravated criminal sexual abuse against his 13-year-old daughter, S.S-F. At trial, the State proceeded on counts III and IV, and the jury found him guilty of those counts. Count III alleged the defendant touched S.S-F.'s breasts and count IV alleged he touched her vagina with his hand. Both counts alleged that S.S-F. was under 17 years old and that she was under the influence of alcohol at the time of the incident. In May 2022, the State filed two additional charges for criminal sexual assault, alleging the defendant placed his penis against S.S-F.'s lips. The State proceeded to trial on one of those counts, and the jury found him not guilty of that count.

¶ 5                                    A. Jury Trial

¶ 6    The following evidence was adduced at trial. S.S-F. testified that in March of 2020, she was 13 years old and lived with her father and his girlfriend, Julianna Burton. In early March, the defendant and Burton broke up, but Burton was still allowed to stay at the house. On March 5, 2020, S.S-F. missed the school bus and stayed home with Burton. After the defendant and Burton argued about the situation, she and Burton stayed elsewhere for the night and returned to their home the next day.

¶ 7    When they returned to the house, the defendant was drinking alcohol, and he and Burton fought about her continuing to live at the house. The defendant decided to go to a hotel for the night and asked S.S-F. to come with him, telling her she could invite friends to join them. The defendant's friend, C.J., drove the defendant and S.S-F. to a hotel. The defendant brought Bud Light and Twisted Tea alcohol to drink. After the defendant and S.S-F. checked into the hotel and went to their room, C.J. joined them but left shortly thereafter. S.S-F.'s mother came to the hotel and took S.S-F. to Walmart where she purchased a phone charger for the defendant, chips, and

2

underwear. S.S-F. then went back to the hotel, stayed in the common area for a while, and then went back to her room.

¶ 8    When she arrived, the defendant was in the room drinking alcohol and gave S.S-F. a Twisted Tea, but she did not like it so she did not drink much. Between 7:30 and 9 p.m., the defendant drank more than one alcoholic beverage, but S.S-F. was not sure if he drank more than five. S.S-F. invited friends to the hotel but only her friend H.L., who was 16 years old, agreed to join her. H.L. was the brother of S.S-F.'s best friend, and S.S-F. wanted to date him. H.L. asked the defendant if the two could date, but her father would not allow them to do so because H.L. was too old for her. H.L. arrived around 9 p.m., and S.S-F. and H.L. went to the pool area of the hotel and sat in the hot tub until approximately 10 p.m. when it closed. The defendant went to the pool area around closing time, and the three went back to the hotel room.

¶ 9    At some point, H.L. drove the defendant and S.S-F. to Circle K where the defendant purchased Fireball Whisky and Mike's Harder Lemonade. When they got back to the hotel, the defendant and S.S-F. continued to drink, but H.L. did not drink any alcohol. The defendant and H.L. were wrestling around. At one point, the defendant picked up S.S-F. and threw her, causing her to hit the air conditioner which made a loud noise.

¶ 10    The defendant and S.S-F. invited H.L. to spend the night in the room with them, but H.L.'s father would not allow him to stay so he left the hotel around 11:30 p.m. S.S-F. walked him outside to his car and then returned to the hotel room. Approximately 10 minutes later, the defendant left the hotel room, but S.S-F. did not know where he went. S.S-F. then drank part of a can of Mike's Hard Lemonade and took one more shot of Fireball Whisky. She estimated that she drank two shots of Fireball that night. Around 12:50 a.m., she was sitting on the floor between the two beds in the hotel room when she posted a short video to her Snapchat account. In the video, which was

3

admitted into evidence and shown to the jury, S.S-F. said "drunk log one," and she stated it was 12:50. The video then cut out. S.S-F. fell asleep on the floor, fully clothed.

¶ 11    The next thing S.S-F. remembered was waking up on and off to the defendant touching her in his bed. S.S-F. was coming in and out of consciousness and was no longer dressed. S.S-F. testified that the defendant tried to "finger me, eat me out, put his penis in my mouth and touch my breasts." At 4 a.m., S.S-F. fully awoke in her father's bed with the defendant on top of her. She ran to the bathroom, locked herself in, and yelled, "What the fuck are you doing? I'm your fucking daughter."

¶ 12    S.S-F. called H.L. and told him she had woken up naked in the defendant's bed, and he was trying to have sex with her. She and H.L. called each other and spoke several times, and she asked H.L. to pick her up because she was uncomfortable. The defendant was outside the bathroom door telling her he would give her money and that she was allowed to date H.L. if she did not tell anyone what happened. The defendant also said the incident was S.S-F.'s fault and that the defendant was going to live with his father who had already passed away. The defendant eventually left.

¶ 13    On direct examination, S.S-F. was questioned about what happened after the defendant left. The following colloquy occurred:

> "Q. And, so you're back in, in the bathroom. He's left. You're on and off the phone with [H.L.]. Is there anything you did while you were in the bathroom?
>
> A. I took a bath.
>
> Q. And, just to be clear, shower or bath?
>
> A. Bath.
>
> Q. Okay. And, when you got in the bath, did you fill it with soap? Were you—or what was going on?

4

A. No. I just sat in the water.

Q. Okay. Why did you take a bath?

A. 'Cause I felt gross.

***

Q. Did you eventually—did you stay awake this whole time, or, or what happened while you were in the tub?

A. I fell asleep in the bathtub."

S.S-F. testified she woke up later and slept in a bed.

¶ 14      Eventually, H.L. arrived at the hotel with a friend and picked up S.S-F. After the defendant left the hotel, he called S.S-F. to ask if she wanted him to leave her money at the front desk or bring it to the room. S.S-F. responded that he should leave the money at the front desk. While checking out of the hotel, a hotel employee gave H.L. an envelope containing $40, which he handed to S.S-F. He then drove his friend home and took S.S-F. to her house and went inside with her. Burton and one of S.S-F.'s friends were at the house when she arrived. At some point, the defendant tried unsuccessfully to get into the house. He was able to throw his phone and wallet inside an open window, and then he left.

¶ 15      Burton called the police. When the ambulance arrived, S.S-F. spoke with EMT Julieann Marie Roark. Roark testified that S.S-F. was 13 years old. She first spoke with S.S-F. in the home but then she decided to move to a private setting and took S.S-F. to the ambulance. Roark described S.S-F.'s demeanor as very quiet. She was reserved and spoke in broken-up sentences. Roark testified that S.S-F. "definitely appeared to be in a state of shock, emotional shock." S.S-F. reported to Roark that she had been digitally penetrated, that the defendant tried to "go down on her and also tried to stick his penis in her mouth." Roark took S.S-F. to Carle Foundation Hospital.

5

¶ 16    At the hospital, S.S-F. was examined by a nurse. S.S-F. wrote down what the defendant had done to her. The note she wrote stated, "fingering me and touching my boobs." S.S-F. was upset and felt terrified and gross at the hospital. A few days later, S.S-F. was interviewed at the Children's Advocacy Center (CAC). She did not remember what she told the interviewer.

¶ 17    In December 2022, S.S-F. spoke with Detective Matthew Bross and a prosecutor. She told them "[t]hat he had tried to finger me, eat me out, put his penis in my mouth and touch my breasts." S.S-F. acknowledged that her statements differed. S.S-F. explained that she did not feel comfortable telling certain people certain facts. She also testified that she did not call the police at the hotel because she did not trust them. She asserted that her testimony was true, and she remembered the defendant touching her breasts and vagina and pressing his penis against her lips. S.S-F. did not remember that she told the hospital nurse and the interviewer at the CAC that the defendant only touched the outside of her vagina. S.S-F. denied fabricating the accusations because she was angry at the defendant for refusing to allow her to date H.L. After the incident, S.S-F. and H.L. dated for three months, and the two were still friends at the time of trial.

¶ 18    H.L. testified similarly to S.S-F. about the incident and asserted that the State's attorney never told him what to say. He testified that he had asked the defendant several times if he could date S.S-F., but the defendant refused. H.L. denied that his testimony was a result of the defendant's refusal to let him date S.S-F.

¶ 19    H.L. testified that on March 6, 2020, he arrived at the hotel around 9 p.m. to visit S.S-F. and the defendant. To his knowledge, he did not believe S.S-F. had been drinking before he arrived. He went to the pool area with S.S-F. and then drove all three of them to Circle K. He was not flirting with or kissing or holding S.S-F.'s hands. Back in the hotel room, the defendant gave S.S-F. alcohol, but H.L. did not drink because he had to drive. H.L. saw S.S-F. drink some Twisted Tea, but he did not remember how much. He did not remember if he told the police that he thought

6

S.S-F. only drank a couple of sips because she did not like the drink. H.L. did not recall the defendant giving S.S-F. the option to have one sip of alcohol.

¶ 20    H.L. and the defendant wrestled around, and at some point, the defendant threw S.S-F. into the air conditioner, causing a noise. During this time, the defendant grabbed S.S-F.'s butt and breasts two to three times each, saying "I made it, so I can touch it." S.S-F. did not appear to be comfortable when the defendant grabbed her.

¶ 21    H.L. left the hotel around 11:15 p.m. At 4:02 a.m., he was awakened by a phone call from S.S-F. She told him that she was calling him from the hotel bathroom. She also told him that she woke up naked with the defendant on top of her and that he had tried to rape her. S.S-F. asked H.L. to pick her up but his father told him it was too early to leave. Following the first call, H.L. and S.S-F. spoke on the phone multiple times. During one call, H.L. heard a male voice outside S.S-F.'s bathroom.

¶ 22    H.L. went to the hotel at 11 a.m. with a friend to pick up S.S-F. After he drove his friend home, he and S.S-F. went to her house. When the defendant arrived at the house, he could not get inside, so he threw his phone and wallet into an open window. Burton then called the police and an EMT arrived. H.L. spoke to the police and gave them a sheet of paper he had created that contained a list of phone calls between him and S.S-F.

¶ 23    The parties stipulated that the defendant and S.S-F. stayed in room 322 at the hotel. Johana Bruens and her mother, Regina Cambre, stayed in the room directly beneath the defendant's hotel room on the date in question. They would both testify that throughout the evening of March 6 and early morning hours of March 7, they heard thuds, banging, and stomping from the defendant's room and filed complaints. Around 4 a.m., Bruens and Cambre heard a female say "stop it" and then Bruens heard the shower start. The parties also stipulated that Wynona Johnson was a guest in room 320 on the date in question, and she saw a female, approximately 13 years old, spending

7

time with a male, approximately 15 years old, at the hotel's hot tub around 10 p.m. A male, who Johnson believed was the female's father, appeared upset about the teenagers spending time together.

¶ 24 Frankie Moore testified that she was a sexual assault nurse examiner (SANE) for Carle Hospital and that she conducted an examination on S.S-F. on March 7, 2020. During the examination, S.S-F. wrote a note stating that she was digitally penetrated and that the person touched her breasts. S.S-F. then said, "I don't honestly remember that much." S.S-F. told the nurse that she had bathed after the incident. Moore observed a sign of physical trauma on S.S-F.'s anatomy, redness on the posterior fourchette, which is a thin piece of skin connecting the labia minora at the bottom of the vulva and is the area that would be penetrated by fingers, a tongue, or a penis.

¶ 25 On cross-examination, Moore testified that while redness could occur from sitting in hot water or a hot tub, she would have expected to see it elsewhere as well not just on the posterior fourchette. The following colloquy occurred:

"DEFENSE COUNSEL: Okay. But it can come from like sitting down so that that piece of your body is touching the bottom of a bathtub or a floor; correct?

MOORE: The posterior fourchette doesn't typically touch where you're sitting.

DEFENSE COUNSEL: Okay. So, if you, for example, were hunched forward in a bathtub with your arms wrapped around your knees, certain parts of your vulva, labia, et cetera, would be touching the floor of the bathtub; correct?

MOORE: It could be."

¶ 26 On redirect examination, Moore testified that she would not have been able to see the redness on the posterior fourchette without "traction," opening up the vaginal area. She saw the redness in the area that fingers, tongue, or a penis would touch if they penetrated the vagina. Moore

8

collected a vaginal swab where she swabbed the cervix, and a vulvar swab between the labia minora and labia majora. The swab of the cervix would have taken her approximately four inches inside the vagina. She testified that the vulvar and vaginal swabs were placed in the same box. Moore also collected swabs of S.S-F.'s neck, breast, and umbilicus. Moore described S.S-F. as tearful, withdrawn, and quiet during the exam.

¶ 27    The parties stipulated that the Illinois State Police Forensic Science Lab received a sexual assault evidence collection kit from the police department along with the defendant's known standard and sent those items to Bode Technology in Virginia for analysis. The forensic biologist analyst found no male DNA in the oral swab of S.S-F. Male DNA was indicated on the vaginal swab, but due to the presence of high levels of total human DNA compared to the male DNA, the sample was not processed for STR analysis. The DNA profile on the neck swab was consistent with a mixture of three or more individuals, including S.S-F. and at least one male contributor. The DNA profile from the breast swab was consistent with a mixture of two individuals, including at least one male contributor. The DNA profile from the umbilicus swab was consistent with a mixture of at least two individuals, S.S-F., who was the major component, and at least one male. Due to the possibility of allelic dropout, no conclusions could be made on the minor alleles for any of those swabs.

¶ 28    Forensic scientist Jennifer Aper, who worked at the Illinois State Police Forensic Science Lab, testified that she received the sexual assault evidence collection kit taken from S.S-F. Aper explained how DNA was extracted from the samples and described the tests that were conducted. DNA was extracted from the samples, and Aper profiled the DNA with the YSTR amplification system. The neck swab had a mixture of DNA from at least three contributors. The major DNA profile was female and was consistent with S.S-F. Bode lab then determined that the minor DNA profiles in the neck swab were inconclusive, meaning they could not be certain of the contributors.

The breast swab had a mix of two contributors. There was too much uncertainty in the data, so Bode lab interpreted that mix as inconclusive. The umbilicus swab had a mix of three contributors, a major female profile which matched S.S-F., and minor DNA profiles that were inconclusive.

¶ 29 Bode lab extracted a quarter of all the vaginal swabs and determined they contained a large amount of female DNA and a small amount of male DNA. Aper performed YSTR testing on these swabs, which allowed her to ignore female DNA and target the male component of the sample. She analyzed the breast swab and detected no results. She profiled two of the vaginal swabs, and they each contained a complete 23 locus YSTR haplotype that could be used for comparison. The haplotypes from the two vaginal swabs had the same contributor and would be expected to occur in one in 2,800 white, unrelated males, one in 2,300 black males, or one in 2,000 unrelated Hispanic males. One in 2,800 is the highest haplotype frequence you can obtain from YSTR testing.

¶ 30 On cross-examination, Aper testified that in their YSTR system, they target .3 nanograms of DNA to obtain a match, but they can get haplotypes from even smaller samples. A nanogram is one billionth of a gram. The results of the testing revealed that H.L. was excluded as a possible contributor, but the defendant was not excluded as a possible contributor to the two vaginal swabs.

¶ 31 On cross-examination, Aper testified that "touch" DNA occurs when someone touches an object, causing skin cells to shed, and leaving DNA on the object. "Transfer" DNA occurs when DNA transfers from one person to another. And a secondary transfer takes place when someone touches DNA on an object that another person left behind. "Tertiary" DNA occurs when a person touches another person and then touches an object, leaving behind the other person's DNA on the object. She also testified that people who share the same bed or towel can both leave DNA behind. On redirect examination, Aper testified that she might anticipate finding transfer DNA on external surfaces of skin and clothing, but not on swabs collected internally.

¶ 32     Detective Bross testified that he was assigned to investigate the case. During his testimony, he identified photographs of the defendant's hotel room, which showed bottles and cans of alcohol left behind. Videos from the hotel were also played during Bross's testimony, showing the defendant and S.S-F. arriving at the hotel; the defendant leaving the hotel; and S.S-F. and H.L. checking out of the hotel. Bross interviewed the defendant on March 18, 2020. The defendant told him that on March 5, 2020, he and his ex-girlfriend, Burton, got into an argument and that Burton then took S.S-F. for the night. On March 6, they argued again, but this time the defendant took S.S-F. to a hotel and told her that if she came with him, she could invite friends. H.L. visited them at the hotel. The three went to a gas station where the defendant bought alcohol, flavored vodka, and then they returned to the hotel. The defendant allowed S.S-F. to drink some alcohol. After H.L. left, the defendant stated he went to a couple of bars. When he returned to the hotel around 1:30 a.m, the defendant found S.S-F. clothed, asleep on the floor between the hotel beds. The defendant went to sleep in his bed. At some point, S.S-F. got into bed with him and hugged his arm, and he fell back to sleep. He was awakened by the slam of a door and S.S-F. yelling at him through the door. When he tried to have a conversation with her, she told him she was going to make allegations against him, and that is when he left the hotel. The defendant left $40 for her at the front desk.

¶ 33     When the defendant returned home, he found himself locked out and was frustrated and angry. He threw his wallet and phone into the house through an open window. He then drove his truck to a train embankment to try to kill himself. The defendant told Bross he was tired of S.S-F.'s and Burton's behavior. He denied S.S-F.'s sexual assault allegations and said that Burton was putting these ideas into her head. He also said his DNA would not be found in the sexual assault kit or on S.S-F.'s clothes.

11

¶ 34    On cross-examination, Bross testified that H.L. told him that S.S-F. had one sip of Twisted Tea and stopped drinking it because she did not like it. H.L. also said she had one shot of Fireball Whisky. S.S-F. told Bross she drank Twisted Tea and Mike's Hard Lemonade, but she did not like either so she stopped drinking them. S.S-F. said she consumed Twisted Tea prior to H.L.'s arrival, a Mike's Hard Lemonade, and two shots of Fireball Whisky. Bross also acknowledged there were some inconsistencies in S.S-F.'s account given to the EMT, the SANE nurse, and the interviewer at the CAC. Bross stated the defendant told him he was staying at the hospital because he tried to commit suicide. On cross-examination, Bross acknowledged that the hotel sheets, towels, and carpet were not processed for DNA evidence, nor were S.S-F.'s clothing or underwear. On redirect examination, Bross testified that no further DNA testing was required because there was no indication there had been ejaculation. Furthermore, when the officers arrived at the hotel, the staff was actively cleaning the hotel room because they were unaware of the events that had transpired; thus, it was possible that the sheets, towels, and other items in the room potentially could have been touched by hotel staff before the officers arrived. Bross also testified that sexual assault survivors "are always bringing up different details, so to have the exact statement from beginning to end would be rare."

¶ 35    Sheriff's Deputy Douglas Bialschki testified that on March 7, 2020, he went to the defendant's house in response to the sexual assault complaint. When he arrived at the home, he learned the defendant had left in a maroon Ford Explorer, which Bialschki located 150 yards west of the nearest county road west of Dewey along a railroad right of way. The Ford was situated at the base of a large pile of debris. When a second police unit arrived, the defendant exited the vehicle and walked towards Bialschki. The defendant was bleeding heavily from his mouth and nose and reported to Bialschki that he tried to kill himself by hitting the large pile of debris.

¶ 36    The defendant's case consisted of recalling Detective Bross and playing a video of S.S-F. walking H.L. out of the hotel to his car and then reentering the hotel and waiting for the elevator. The defendant did not testify.

¶ 37                                B. Closing Arguments

¶ 38    Review of the record reveals there are approximately 60 pages of combined closing arguments by the prosecution and defense counsel. In determining whether comments made during closing argument were proper, a reviewing court must examine the closing argument in its entirety and view the complained of remarks in context. *People v. Burman*, 2013 IL App (2d) 110807, ¶ 25. Thus, to provide the context for our review, we set out a significant portion of closing arguments below.

¶ 39    During closing, defense counsel argued that S.S-F. provided inconsistent accounts of the acts the defendant had committed, stating:

>       "The allegations of what the sexual misconduct they are horrible to listen to. They're disturbing to listen to, which is why, when we did our jury selection, I asked each of you if you thought you could still be fair, even hearing these terrible things, and I hope that you can be because the inconsistencies between the statements, they're not minor. It's not something that you forget when this happens to you. And, regardless of how old she was, and, regardless of how she said this happened, the differences are significant, incredibly significant because they have gone from the March 7th of 2020 statement where we have multiple forms of oral sex, penetration, breasts, the whole nine yards, later that same day she tells the SANE nurse those other things didn't happen. It was just a touch, a touch, and I don't remember anything else. Then, at the CAC, she said the same thing, only touched on the outside, no penetration."

13

¶ 40    Defense counsel then challenged why S.S-F. did not tell the worker at the CAC all the things that defendant had done to her, arguing:

> "And, in particular, I want you to remember that the people who work there, the people who work at the Children's Advocacy Center, they are trained professionals. They know how to talk to kids. They know how to talk to teenagers. They receive hours and hours and hours of training. They are specialized. She could not get [S.S-F.] to say the other things that purportedly happened to her, even with all of that training. *** The question is why could a trained professional whose sole job is interviewing children to get the truth about what happens to them, why would she not be able to talk to that person about what happened?"

¶ 41    Defense counsel further suggested that S.S-F. was lying, arguing:

> "Again, there's another statement only a few months ago which has the most details in it of what we've heard, and those details are—they're not minor. You know, in, in order for somebody to say oral sex performed by a parent on them, oral sex forced on you by a parent, digital penetration versus outside of the body, breasts, neck, these are not minor details. It is not something that just pops up over time. These are seared into your memory as trauma. And if all of those things did, in fact, happen, then why are we changing our story so many times?"

¶ 42    In challenging the DNA tests, defense counsel argued:

> "You know, there are no other tests done in this case. And I think you heard Detective Bross say, well, we didn't think there was any reason to do any other tests. They didn't test the sheets. They didn't test the towels. They didn't test

14

anything from the room. They didn't test the alcohol cans. They didn't test her clothing. They didn't test her underwear."

¶ 43    Defense counsel also argued that the vaginal swabs were not kept separate from one another in the sexual assault kit and, therefore, DNA from one swab could have been transferred to the other, stating:

> "So think of this—and there's a million ways transfer can occur. Right now, as I sit here, I'm touching this table. My DNA is on this table. DNA will survive water. It will survive a washing machine. So, if you put DNA through a washing machine, it's still gonna pop up when that's done."

¶ 44    Defense counsel further argued that S.S-F. fabricated the allegations or perhaps she believed them to be true because she was drunk and dreaming, arguing:

> "So I think the last and probably most important question that you're gonna have to ask yourself, once you've taken a look at all of this evidence, why would she ever say those things? Why would a, a 13 year old say this if it didn't happen? And, you know what, I, I'll be honest, I don't know why she would make that up. I do know that her father has categorically denied all of that from the beginning and has had to listen to himself be accused of these things and be traumatized by that to the point where he felt suicidal after it happened."

¶ 45    Defense counsel then suggested S.S-F. could have been fabricating the allegations because the defendant would not allow her to date H.L. or because she was sick of her dad telling her what to do.  Finally, defense counsel argued that the redness observed by nurse Moore could have been caused by something other than assault, including sitting in a bathtub. Tying up her closing argument, defense counsel stated:

15

"So, when you go back into the jury room and you deliberate, these are all factors that you must consider. What are the facts? What is proven? Not what is assumed, not what is inferred, but what is proven to you beyond a reasonable doubt? And the proof here really come down to what [S.S-F.] says happened and what [the defendant] denies happened. And the evidence in support of that, in support of what she says are her statements, which have changed pretty dramatically over time, a DNA result that could have been based on a handful of skin cells and moved around from him to her to the bed to the towel to whatever. There is—there is no way to tell exactly how that got on there. Her a little bit of redness and statement to the SANE nurse, which could also have been explained by her sitting in the bathtub for a period of time. And that's it. That's the evidence."

¶ 46 During rebuttal closing argument, the prosecutor argued:

"At no point—at no point—it was a complete mischaracterization of testimony—did [S.S-F.] ever say she was sitting in a tub, so this whole thing about, ladies, what happens when you sit for a prolonged period of time, never once in testimony was that ever said that she was sitting anywhere for a prolonged period of time. She said she laid down and took a bath. She never talked about hot water."

¶ 47 The prosecutor further argued:

"Inferences from the evidence that could be drawn from it, that perhaps a 13 year old is scared because this happened. Perhaps because a 13 year old doesn't want to tell every single person she talks to every single thing and is beaten down about the actual mental problems that that might cause telling every single person. Think about the embarrassment that this had to be for that little girl in her own

16

family to have to come home, what happened, what did he do? She has sisters and brothers. We got all these people asking you questions right away."

The court overruled defense counsel's objection to the prosecutor's arguments.

¶ 48    In discussing that S.S-F. changed her account of the incident, the prosecutor stated:

"Because she remembered him touching her breasts to the latter two people and remembered the oral sex part to the first person and then—later on, that's fairly, fairly common with people with trauma, especially this level of trauma."

¶ 49    In explaining that attorneys are allowed to interview witnesses before trial, the prosecutor stated:

"Yes, and one of the instructions are going to tell you, we do happen to meet with our witnesses beforehand to go over trial testimony the same way defense counsel meets with their clients. Do you actually think we walk in here without having talked to them about their statements to see what they know, what they don't know? [S.S-F.] testified credibly across the board."

¶ 50    The prosecutor also argued that the defendant should have called a witness, stating "[defense counsel] wants to know why a trained CAC forensic interview couldn't get somebody to talk, then she should have subpoenaed her in her [*sic*] and asked her those questions because she has subpoena power, too."

¶ 51                          C. Verdict and Posttrial Motions

¶ 52    The jury found the defendant guilty of aggravated criminal sexual abuse for touching S.S-F.'s vagina and of aggravated criminal sexual abuse for touching S.S-F.'s breasts. They also found the separate element that S.S-F. was under the influence of alcohol and that the defendant knew or should have known that fact at the time of those offenses was proven. However, the jury found the defendant not guilty of criminal sexual assault for placing his penis on S.S-F.'s lips. The trial court

17

denied the defendant's motion for a new trial and sentenced him to concurrent sentences of seven years' imprisonment on each count. The defendant filed a timely appeal.

¶ 53                                    II. ANALYSIS

¶ 54    On appeal, the defendant contends that the prosecutor's remarks during rebuttal closing arguments were improper where the prosecutor vouched for the credibility of the State's witnesses; shifted the burden of proof to the defense; misstated the evidence; and asserted facts not in evidence. The State responds that the prosecutor's remarks were invited by trial counsel's own closing argument to the jury and that any error that might have resulted was harmless.

¶ 55                              A. Standard of Review

¶ 56    The defendant argues that the standard of review when examining closing remarks is *de novo*. As the State correctly notes, our appellate courts are divided over whether to apply an abuse of discretion standard or a *de novo* standard to allegations of prosecutorial misconduct. *Burman*, 2013 IL App (2d) 110807, ¶ 26. This is the result of two supreme court cases. In *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), the *de novo* standard of review was applied to whether a prosecutor's remarks were so egregious as to require a new trial. However, in *People v. Blue*, 189 Ill. 2d 99, 128 (2000), the court applied the abuse of discretion standard when reviewing a prosecutor's remarks during closing argument. A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Arze*, 2016 IL App (1st) 131959, ¶ 86. Where the result would be the same regardless of the standard of review applied, the courts have noted the conflict but have declined to determine the appropriate standard. *Burman*, 2013 IL App (2d) 110807, ¶ 26. We need not decide that question here as our conclusion would remain the same under either standard.

18

¶ 57                          B. Plain Error Review

¶ 58    The defendant concedes that he did not object to all of the State's erroneous statements made during rebuttal closing argument or raise the issues in a posttrial motion; nevertheless, he argues that review and relief are warranted under either prong of the plain-error doctrine or, alternatively, as a claim of ineffective assistance of trial counsel for failing to preserve the error.

¶ 59    "To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion." *People v. Sebby*, 2017 IL 119445, ¶ 48. "Failure to do either results in forfeiture." *Id.* Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The plain-error doctrine permits a reviewing court to consider an unpreserved error if either (1) the evidence is so closely balanced that the error threatened to tip the scales of justice against the defendant (*i.e.*, the jury's guilty verdict may have resulted from the error and not the evidence), or (2) the error is so serious that it affected the defendant's substantial rights, and thus denied him a fair trial. *Id.*; *People v. Jackson*, 2022 IL 127256, ¶ 19. Under either prong, the burden of persuasion remains with the defendant. *People v. Rodriguez*, 2014 IL App (2d) 130148, ¶ 73. "The first step in plain error review is to determine whether a clear or obvious error occurred." *People v. Finlaw*, 2023 IL App (4th) 220797, ¶ 47.

¶ 60                     C. Improper Remarks During Closing

¶ 61    A defendant seeking reversal of his conviction based upon improper remarks made during closing argument faces a difficult burden. *People v. Holmon*, 2019 IL App (5th) 160207, ¶ 48. During closing argument, the prosecution may comment on the evidence presented, reasonable inferences from that evidence, and the credibility of the witnesses. *Burman*, 2013 IL App (2d) 110807, ¶ 25. "It is well established that prosecutors are afforded wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice

19

to the defendant." *People v. Kitchen*, 159 Ill. 2d 1, 38 (1994). "Substantial prejudice occurs if the improper remarks constituted a material factor in the defendant's conviction." *People v. Johnson*, 2023 IL App (5th) 190426-B, ¶ 35. An improper remark constitutes a material factor where the jury could have reached a contrary verdict had the improper remark not been made or where a reviewing court cannot say that the prosecutor's improper remark did not contribute to the defendant's conviction. *Id.* "This standard is similar to the standard applied in plain error analysis." *Id.* (citing *People v. Jackson*, 2020 IL 124112, ¶ 83). Closing arguments are viewed in their entirety, and the challenged remarks must be considered in context "rather than focusing on selected phrases or remarks." *People v. Runge*, 234 Ill. 2d 68, 142 (2009); *Holmon*, 2019 IL App (5th) 160207, ¶ 51.

¶ 62                                    1. Improper Vouching

¶ 63     The defendant contends the prosecutor improperly vouched for the credibility of the State's witnesses by asserting he had vetted the witnesses before they testified. He further contends that the prosecutor improperly vouched for the credibility of S.S-F. During rebuttal arguments, the prosecutor asked the jurors, "Do you actually think we walk in here without having talked to them about their statements to see what they know, what they don't know?" The prosecutor continued, "[S.S-F.] testified credibly across the board." The defendant argues these comments were improper because they suggested that the prosecutor presented only witnesses whose stories he believed, and he stated outright that S.S-F., who was the key witness against him, was credible. The State counters that the prosecutor did not personally vouch for the witnesses and was merely responding to defense counsel's attack on S.S-F.'s credibility.

¶ 64     It is improper for a prosecutor to personally vouch for the credibility of a witness or to bolster a witness's testimony. *Johnson*, 2023 IL App (5th) 190426-B, ¶ 33. Improper bolstering

20

involves an expression of a prosecutor's personal belief in the credibility of a witness. See *People v. Rogers*, 172 Ill. App. 3d 471, 476 (1988).

¶ 65    In support of the defendant's argument, he relies on *People v. Boling*, 2014 IL App (4th) 120634, ¶¶ 125-27, where the appellate court concluded the prosecutor improperly expressed his own opinion about a witness's credibility when he stated during closing argument that " 'We can believe' " a witness and " 'I do think [the witness's] statements are credible. They are believable. They are honest.' " The defendant also relies on *People v. Lee*, 229 Ill. App. 3d 254, 259-60 (1992), where the appellate court concluded that the prosecution improperly and prejudicially expressed its personal belief regarding a witness's credibility when it stated during rebuttal closing argument that an officer " 'happened to be extremely honest in my humble opinion,' " and " 'He is telling you the truth.' " The defendant posits that the prosecutor's comments in the instant case were like those in *Boling* and *Lee*.

¶ 66    By contrast, the State contends that the instant case is akin to *People v. Olla*, 2018 IL App (2d) 160118, ¶ 42, where the appellate court, in finding no error had occurred in the prosecutor's closing rebuttal argument, stated, "Here, the defense placed A.F.'s credibility at issue. In opening statements and on cross-examination, the defense focused on inconsistencies in her statements." Thus, the *Olla* court concluded that the prosecutor could fairly comment on A.F.'s credibility, including the lack of a motive for her to lie. *Id.*

¶ 67    We find the State's argument persuasive as a prosecutor may respond to comments made by defense counsel that clearly invite a response. *People v. French*, 2017 IL App (1st) 141815, ¶ 48. Here, the record shows it was the defendant's strategy to attack S.S-F.'s credibility by arguing that she lied about the events that occurred in the hotel room, that she fabricated the allegations against the defendant because she was angry with him, or that she believed the allegations to be true because she was drunk and dreaming. Furthermore, during closing argument, defense counsel

argued that S.S-F. was inconsistent in relating to different people the specific acts that the defendant committed. In light of these arguments, the prosecutor responded by arguing that S.S-F.'s testimony was credible, that her prior statements were reasonably consistent, and that any minor inconsistencies were explained by her testimony that she was young, upset, and not as comfortable talking to some people as she was to others. Accordingly, we find no clear or obvious error.

¶ 68                                    2. Burden Shifting

¶ 69    The defendant next argues that the prosecutor shifted the burden of proof to the defendant by telling the jury that he could have subpoenaed a witness from CAC. The burden is on the prosecution to prove beyond a reasonable doubt all the material and essential facts constituting a crime committed by an accused. *People v. Armstead*, 322 Ill. App. 3d 1, 10 (2001). A defendant has no duty to produce evidence at trial, and the prosecution may never shift its burden of proof to a defendant. *People v. Gavin*, 2022 IL App (4th) 200314, ¶ 67 (quoting *People v. Mudd*, 2022 IL 126830, ¶ 34).

¶ 70    During closing arguments, defense counsel argued that the CAC interviewer, a person trained to interview children, reported that S.S-F. stated that the defendant only touched the outside of her vagina, whereas she told the EMT and SANE nurse that she was penetrated. In rebuttal, the prosecutor stated, "[Defense counsel] wants to know why a trained CAC forensic interview couldn't get somebody to talk, then she should have subpoenaed her in her [*sic*] and asked her those questions because she has subpoena power, too." The defendant insists the prosecutor's remarks were improper because he suggested to the jury that the defendant could have provided some sort of explanation but failed to do so. The State maintains that the prosecutor's remarks were a proper response to defense counsel's claims that S.S-F. fabricated her allegations by

22

questioning why S.S-F. was unable to reveal all of the alleged abuse even to a trained CAC professional.

¶ 71    Once again, we find the prosecutor's remarks were a response to defense counsel's argument suggesting that S.S-F.'s testimony was fabricated, because she did not relate the same facts in her interview at the CAC as she previously related. See *French*, 2017 IL App (1st) 141815, ¶ 48. The prosecutor's remark did not suggest the defendant had any obligation to present the CAC interviewer or indeed to present any evidence whatsoever. Because we find that the prosecutor did not improperly shift the burden of proof to the defendant, we find no clear or obvious error; thus, plain error is inapplicable.

¶ 72                              3. Misstatements of Evidence

¶ 73    "It is improper for a prosecutor to misstate the evidence or argue facts not in evidence." *Johnson*, 2023 IL App (5th) 190426-B, ¶ 33. The defendant asserts that the prosecutor improperly misstated the evidence during the rebuttal portion of his closing argument when he stated:

> "At no point—at no point—it was a complete mischaracterization of testimony—did [S.S-F.] ever say she was sitting in a tub, so this whole thing about, ladies, what happens when you sit for a prolonged period of time, never once in testimony was that ever said that she was sitting anywhere for a prolonged period of time. She said she laid down and took a bath. She never talked about hot water."

¶ 74    The defendant contends the remarks were a misstatement of the evidence where S.S-F. plainly testified that she sat in the bathtub and even fell asleep there. He further contends these remarks were prejudicial because a key part of his defense at trial was that the redness observed by nurse Moore could have been caused by something other than assault, including sitting in a bathtub.

23

¶ 75    We find the defendant's argument unavailing. The prosecutor's remarks were not a misstatement of fact where nurse Moore testified that while the redness she observed theoretically could have occurred from sitting in hot water or a hot tub, she would have expected to see redness elsewhere, not just on the posterior fourchette. Furthermore, on cross-examination, defense counsel posed a hypothetical to nurse Moore, suggesting that if she were hunched forward in a bathtub with her arms around her knees, certain parts of her vulva, labia, et cetera, would be touching the floor of the bathtub, to which nurse Moore responded, "It could be." However, there had been no testimony that S.S-F. sat in a hunched position in a tub of hot water, but rather, she testified that she fell asleep in the bath, presumably in a prone position. Accordingly, we do not find the prosecutor's remarks misstated the evidence.

¶ 76                              4. Facts Not in Evidence

¶ 77    The defendant argues that the prosecutor improperly argued facts not in evidence by suggesting that S.S-F.'s change in her details of the events was usual among trauma victims. The defendant contends there was no evidence presented which established that S.S-F. would have been emotionally traumatized by telling the EMT, the nurse, and the detectives the same account about the alleged incident. Here, S.S-F.'s credibility was a key issue at trial, and thus, the defendant insists the prosecutor's comments were prejudicial as they provided an unsubstantiated reason why S.S-F. told different versions of her account to different people.

¶ 78    While a prosecutor may argue facts and legitimate inferences drawn from the evidence presented, it is improper for a prosecutor to argue assumptions or facts not based upon the evidence in the record. *People v. Williams*, 2023 IL App (1st) 192463, ¶ 134. The defendant specifically contends the following remarks were improper:

"Because [S.S-F.] remembered him touching her breasts to the latter two people and remembered the oral sex part to the first person and then—later on, that's fairly, fairly common with people with trauma, especially this level of trauma."

¶ 79    The defendant concedes that Detective Bross testified that sexual assault complainants sometimes tell different people different versions of the alleged incident, but the defendant maintains there was no testimony that a victim changing their story is "fairly common with people with trauma, especially this level of trauma." Furthermore, he maintains that because there was no expert testimony as to what level of trauma S.S-F. experienced, the prosecutor asserted facts not in evidence. He argues that the prosecutor's improper statements served to draw the jury's attention toward S.S-F.'s alleged trauma which was an unsuitable tactic that served "only to divert the jury's attention from the more tangible issues to be considered." *People v. Johnson*, 208 Ill. 2d 53, 80 (2003).

¶ 80    We find the defendant's argument without merit where the prosecutor's remarks in rebuttal were invited by defense counsel's argument. *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 56. ("Statements [made in closing argument] will not be held improper if they were provoked or invited by the defense counsel's argument." (Internal quotation marks omitted.)). In closing argument, defense counsel suggested that evidence that S.S-F. was lying was the fact that she provided conflicting details to different individuals investigating her claims. Defense counsel in closing arguments told the jury that these details would be "seared into your memory as trauma."

¶ 81    Furthermore, a prosecutor is allowed to argue facts and legitimate inferences drawn from the evidence. *Williams*, 2023 IL App (1st) 192463, ¶ 134. Here, a reasonable inference from the evidence was that S.S-F. was traumatized. EMT Roark testified that S.S-F. was very quiet, reserved, and speaking in broken-up sentences. Roark testified that S.S-F. appeared to be in a state of emotional shock. Further, the SANE nurse testified that S.S-F. was very tearful, withdrawn, and

quiet. The evidence supported the prosecutor's inference that S.S-F. was traumatized by the abuse, especially as the perpetrator was her own father. Hence, we do not find this portion of the prosecutor's remarks constituted error.

¶ 82   The defendant argues that the prosecutor asserted facts not in evidence where he told the jury that S.S-F.'s family was aggressively asking her questions about the incident immediately after it took place although there was no evidence presented that her family questioned her. Specifically, the prosecutor stated:

> "Inferences from the evidence that could be drawn from it, that perhaps a 13 year old is scared because this happened. Perhaps because a 13 year old doesn't want to tell every single person she talks to every single thing and is beaten down about the actual mental problems that that might cause telling every single person. Think about the embarrassment that this had to be for that little girl in her own family to have to come home, what happened, what did he do? She has sisters and brothers. We got all these people asking you questions right away."

¶ 83   The defendant claims the statements were improper because according to S.S-F.'s testimony, her siblings were not at the house when she arrived home. The State counters that the prosecutor's remark was a reasonable inference that S.S-F. would be embarrassed by the inevitable questions from her siblings about what sex acts her father had inflicted on her.

¶ 84   We find that the prosecutor's remarks were not improper because they were reasonable inferences from the evidence at trial. Thus, because we find no "clear or obvious error" occurred, plain error review is inapplicable. *Finlaw*, 2023 IL App (4th) 220797, ¶ 47.

¶ 85                    D. Ineffective Assistance of Counsel Claim

¶ 86    Alternatively, the defendant argues that trial counsel was ineffective for failure to preserve the record. Because we find no error, we decline to consider defendant's claim of ineffective assistance of counsel. *People v. Moon*, 2019 IL App (1st) 161573, ¶ 47.

¶ 87                                III. CONCLUSION

¶ 88    For the foregoing reasons, we affirm the trial court's judgment.


¶ 89    Affirmed.